**In re Mark D. ROSS and Annetta M. Ross, Debtors.**

**Bankruptcy No. 93–81196.**

United States Bankruptcy Court, C.D. Illinois.

Nov. 18, 1993.

James S. Brannon, Peoria, IL, for debtors.

Richard N. Gentry, Jr., Behrends & Gentry, Peoria, IL, for Healthcare Family Credit Union.

Michael D. Clark, Peoria, IL, Trustee.

## OPINION

WILLIAM V. ALTENBERGER, Chief Judge.

The Debtors filed a Chapter 13 case and two objections to confirmation of their plan were filed. The first one was filed by the Chapter 13 Trustee. Prior to filing their Chapter 13 case, the Debtors entered into a long term lease of real estate with a $300.00 yearly rental, and agreed to purchase a cabin located on the real estate for $15,000.00. The purchase is being financed by the Debtor, MARK D. ROSS's, employer. Title to the cabin is in the employer who pledged a certificate of deposit to the seller to guarantee the Debtors pay for the cabin. The Debtors are paying $384.00 per month. The current value of the cabin is only $5,200.00. The cabin is used solely for recreational purposes. The Chapter 13 Trustee objects to the Debtors paying $384.00 per month for a recreational cabin, when the Debtors' other unsecured creditors will be receiving only a 9% dividend.[1] The Debtors contend that if they don't fully pay for the cabin the employer will discharge the Debtor, MARK D. ROSS.

The relationship between the Debtors and the employer is in the nature of a co-signer or guaranty relationship. The issue is whether the Debtors' Chapter 13 plan unfairly discriminates in favor of unsecured co-signer or guaranteed debt and against other unsecured debt. For the following reasons this Court finds it does not.

In *Matter of Vanleeuween,* 17 B.R. 189 (Bkrtcy.S.D.Ohio 1982), the court permitted, over the objection of the Chapter 13 Trustee, the debtor to separately classify a debt co-signed by his employer who also happened to be his brother, and pay that debt in full while paying other unsecured creditors 20%. The court reasoned:

> Looking to the plan *instanter,* the Plan does not unfairly discriminate by deferring payments to one class of unsecured creditors, but distributes the *aliquot* shares simultaneously. The debtor, in fact, demonstrates generous good faith to all unse-

---

1. The Chapter 13 Trustee's report indicates the payment to unsecured creditors will only be 1%.

cured creditors. For the privilege of employing the Chapter 13 process, he is attempting to pay unsecured creditors at least 20% of their claims from future earnings when a Chapter 7 administration would pay them nothing. The "preference" demonstrated to a guarantor-brother (and employer) is not evidence of either unfair discrimination or bad faith. On the contrary, this creditor is the employer, from whom all future dividends will originate. Even if this employer were not his brother, the special circumstances of preserving a good relationship with the veritable source of the distribution in the best interests of all creditors justifies the separate classes.

In *In re Todd*, 65 B.R. 249 (Bkrtcy.N.D.Ill. 1986), the court held that it was permissible for the debtor, a policeman, to separately classify a debt that was co-signed by his street partner. Again, the co-signed debt was being paid 100% while the other unsecured creditors were receiving approximately 10%. The court stated:

> The four factors most often used by bankruptcy courts in determining whether a classification is unfairly discriminatory are:
> (1) Whether the discrimination has a reasonable basis;
> (2) Whether the debtor can carry out a plan without such discrimination;
> (3) Whether such discrimination is proposed in good faith; and
> (4) Whether there is meaningful payment to the class discriminated against.

(citations omitted).

Keeping the above four factors in mind, this Court concludes that Todd's plan does not unfairly discriminate. Todd's justification for the unequal treatment of one unsecured claim is that the debt to the Patrolmens Credit Union was cosigned by Todd's police street partner. He asserted the need to maintain confidence and harmony with the man who thereby helped him, given the mutual reliance in their daily dangerous police work. Thus, the Court cannot say that the discrimination has no reasonable basis. Moreover, Todd might not carry out this plan without such dis-

crimination because unless this cosigned obligation is repaid, the creditor can proceed against the cosigner, who in turn might put indirect pressure on debtor and interfere with the "fresh start" the Bankruptcy Code is supposed to provide.

Applying the above four factors to the facts of the case before this Court, this Court concludes the Chapter 13 plan does not unfairly discriminate against the Debtors' unsecured creditors. If the Debtors do not pay for the cabin and the employer is forced to do so, Debtor, MARK D. ROSS, will lose his job and the Debtors will lose the ability to fund the Chapter 13 plan. There is no indication the discriminatory treatment is proposed in bad faith. The only negative factor is that the dividend to the unsecured creditors cannot be considered a meaningful payment. However, it is the Debtors' best effort.

■ The Healthcare Family Credit Union (CREDITOR) also objected to confirmation of the Chapter 13 plan. Prior to the filing of their Chapter 13 case, the Debtors borrowed from the CREDITOR and assigned the Debtor, ANNETTA M. ROSS's, interest in her employer's employees' Thrift and Savings Plan (THRIFT PLAN) as security for the borrowing. The value of her interest in the THRIFT PLAN is $13,986.54. $5,700.19 of that amount represents her contributions. The balance represents a combination of employer contributions and earnings on both classes of contributions. Her interest is fully vested.

The THRIFT PLAN is a "church plan" within the meaning of Section 414(e) of the Internal Revenue Code. 26 U.S.C. § 414. The THRIFT PLAN contemplated receiving a determination from the Commissioner of the Internal Revenue Service that it is a qualified plan under the Internal Revenue Code. That determination was received. The THRIFT PLAN is an employer matching plan where the employee is entitled to make voluntary contributions which the employer matches. The employee's contributions are freely withdrawable by the employee. After the employer's matching contributions have vested, they too are available for

withdrawal by the employee. If the employee's employment is terminated, the employee is also entitled to the voluntary contributions and the employer's matching contributions, if vested. The THRIFT PLAN contains a spendthrift provision which reads as follows:

> Except to the extent as may be required by applicable law, the rights, or interest of any Member or his Beneficiaries to any benefits or future payments hereunder shall not be subject to attachment or garnishment or other legal process by any creditor (other than the Employer) of any such Member or Beneficiary, nor shall any such Member or Beneficiary have any right to alienate, anticipate, commute, pledge, encumber, or assign any of the benefits or payments which he may expect to receive, contingently or otherwise, under this Plan. The preceding sentence shall not apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a Member pursuant to a "qualified domestic relations order," as defined in Section (p) of the Code.

The CREDITOR's policy is to accept an assignment of an interest in the THRIFT PLAN in either of two situations. First, an assignment is taken when the employee wants to withdraw the interest, but has to wait for the withdrawal to be processed. The CREDITOR makes a loan to the employee for the amount being withdrawn and the loan is repaid when the withdrawal is completed. Second, an assignment is taken when the employee wishes to borrow from the CREDITOR, but has no other collateral to give as security for the loan. In both situations the administrator of the THRIFT PLAN honors the assignment. The Debtor's situation is the latter.

After the CREDITOR made the loan to the Debtors and took an assignment of the interest in the THRIFT PLAN, the Debtors filed their Chapter 13 case. Their Chapter 13 plan treats the CREDITOR partially as secured and partially as unsecured, with unsecured creditors to be paid approximately 9%.[2] The CREDITOR objected to the Chapter 13 plan on the grounds the Chapter 13 plan does not propose to pay the CREDI-TOR the full value of its security as the Chapter 13 plan does not treat the assignment of the Debtor's interest in the THRIFT PLAN as security. The Debtors, relying on *Patterson v. Shumate,* — U.S. —, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), take the position that the assignment is invalid as the plan is an ERISA qualified plan containing an ERISA required spendthrift clause which prevents assignment of the interest in the THRIFT PLAN. The CREDITOR contends that notwithstanding the intent to have an ERISA qualified plan, it is not so qualified because of the employee's withdrawal rights and as it is not so qualified the rule in *Patterson v. Shumate, supra,* is not applicable.

The issue before this Court is not the same issue decided in *Patterson v. Shumate.* Therefore, that decision is not controlling in this case. The issue in *Patterson v. Shumate* arose under § 541 of the Bankruptcy Code, 11 U.S.C. § 541, and involved whether a debtor's interest in a pension plan was property of the debtor's Chapter 7 bankruptcy estate. The specific issue was whether an anti-alienation provision contained in an ERISA-qualified pension plan constituted a restriction on transfer enforceable under "applicable nonbankruptcy law," and whether, accordingly, a debtor may exclude his interest in such a plan from the property of the bankruptcy estate. In this case the issue does not arise under § 541, but under § 1325 of the Bankruptcy Code, 11 U.S.C. § 1325, which sets the standards for confirmation and requires, in the context of this case, that the creditor be paid:

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
>
> . . . .
>
> (5) with respect to each allowed secured claim provided for by the plan—
>
> . . . .
>
> (B) . . . .
>
> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim.

---

2. As previously noted the Chapter 13 Trustee believes the distribution will be 1%.

11 U.S.C. § 1325(a)(5)(B)(ii). In other words, a creditor must be paid the value of its security.

The specific issue in this case is whether the Debtors may assign the interest in the THRIFT PLAN as security notwithstanding the spendthrift provision. In a broad sense, it is the same issue that arises under an inter vivos or testamentary trust, where the beneficiary tries to assign an interest contrary to a spendthrift provision.

■■■ As a general rule, a beneficiary to a trust with a spendthrift provision cannot assign that interest as security for a loan. If an assignment is given contrary to the prohibition, the assignment may be revoked. The creditor has a duty to investigate and determine whether there is any such prohibition, and if it fails to do so, or accepts an assignment contrary to the prohibition, it must accept the consequences. William F. Fratcher, *Scott on Trusts*, (Fourth Edition) Vol. IIA, Little Brown and Company, § 152.3 and .6.

Similarly, the courts have refused to recognize an assignment contrary to the spendthrift clause in an ERISA qualified plan. In *Smith v. Mirman*, 749 F.2d 181 (4th Cir. 1984), the court held that the debtor's pre-bankruptcy assignment of his interest in an ERISA plan executed after the corporate termination of the plan but prior to actual distribution of the plan assets, was invalid:

Congress enacted ERISA, 29 U.S.C. § 1001 *et seq.*, to establish "a comprehensive federal scheme for the protection of pension plan participants and their beneficiaries." Its "most important purpose" is to "assure American workers that they may look forward with anticipation to a retirement with financial security and dignity, and without fear that this period of life will be lacking in the necessities to sustain them as human beings within our society." Congress prescribed in ERISA detailed and comprehensive provisions relating to reporting and disclosure, participation and vesting, funding of plans, fiduciary responsibilities of plan administrators or trustees, enforcement, and the necessity for plan termination insurance in certain instances. Among the provisions designed to "further ensure that the employee's accrued benefits are actually available for retirement purposes" was the requirement that benefits may not be assigned or alienated.

In order to induce employers to establish ERISA pension and profit sharing plans, Congress provided favorable tax treatment for both employers and participants in plans determined to be qualified by the Internal Revenue Service. Under the Internal Revenue Code, a qualified plan not only must reflect the anti-alienation language of ERISA itself, but must unequivocally prohibit any access to plan funds by creditors of participants.

. . . .

Thus, a review of the relevant legislative history, case law, and statutory provisions reveals a strong public policy against the alienability of an ERISA plan participant's benefits. Even the narrow judicial and statutory exceptions to the alienation prohibition occur mainly when a participant is receiving benefits under the plan, not (as we have here), where there is a fund awaiting distribution. None of these exceptions applies to the case before us.

. . . .

We see a danger in eroding through exception the anti-alienation policy of ERISA. That entire legislation was aimed at guaranteeing the security of retirement income for American workers. This was achieved primarily through the vesting and funding requirements, but the additional safeguard of non-alienability of one's plan interest is no less important. We decline to participate in the diminution of these safeguards in circumstances which might seem harmless enough in particular instances but which, in the aggregate, might invite creditors to believe that ERISA funds are not, after all, inviolate.

Moreover, our holding that the non-assignability provisions of ERISA and the Internal Revenue Code continue to govern during this uncertain interval between termination (or vote to terminate) and distribution defeats the legitimate expectations of no one. In the normal course of events,

participants have no expectation of receiving any funds from their plans prior to retirement, so their financial planning is not based on the possibility of premature distribution. Third party creditors have been forewarned by statute that they may not assume an interest in these funds or subject them to garnishment or execution of any kind. Such creditors must seek their security elsewhere than in the pension and profit-sharing interests of their debtors.

Therefore, the CREDITOR's objection to confirmation based on the assignment should be denied. However, as to the balance of its objection, confirmation should be denied. The CREDITOR also objects to confirmation under § 1325(a)(5)(B)(ii) on the grounds that it is not being paid the value of its security, because other security for the loan is not considered under the Debtors' plan, specifically $420.62 in various accounts with the Debtors upon which it has a statutory lien, and a 1990 Dodge Grand Caravan which the CREDITOR values at $8,337.00 but which the Debtors' plan undervalues. The Debtors now agree that the value of the vehicle is $8,337.00.

In summary, the plan is not confirmable. The Debtors must propose to pay the CREDITOR based upon the $420.62 in the various accounts, and the vehicle valued at $8,337.00. However, the Debtors' plan need not consider the assignment of the THRIFT PLAN as security for the lender.

Therefore, for the reasons stated, the Debtors' Chapter 13 plan is not confirmed. The Debtors should be given an opportunity to amend their plan in accordance with the provisions of this Opinion.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ORDER

For the reasons set forth in the Opinion entered this day; IT IS HEREBY ORDERED that the Debtors' Chapter 13 plan is not confirmed, and the Debtors are given twenty-one (21) days within which to file an amended plan.